# United States Court of Appeals for the Federal Circuit

———————————

**ALMOND BROS. LUMBER CO., BIGHORN LUMBER COMPANY, BLUE MOUNTAIN LUMBER PRODUCTS, LLC, CF INDUSTRIES, INC. (FORMERLY KNOWN AS CLEARWATER FOREST INDUSTRIES), COLLINS PINE COMPANY, CODY LUMBER, INC., D.R. JOHNSON LUMBER CO., EMPIRE LUMBER CO., F.H. STOLTZE LAND & LUMBER COMPANY, GRAYSON LUMBER CORP., HAMPTON RESOURCES, INC., HARWOOD PRODUCTS INC., HEDSTROM LUMBER COMPANY, INC., IDAHO VENEER COMPANY, INTERMOUNTAIN RESOURCES, LLC, MOUNTAIN VALLEY LUMBER CO., INC., NEIMAN SAWMILLS, INC., NORTHERN LIGHTS TIMBER & LUMBER, INC., OCHOCO LUMBER COMPANY, PINECREST LUMBER CO. (DIVISION OF GREEN BAY PACKAGING, INC.), PRECISION PINE & TIMBER, INC., ROSBORO, LLC, RSG FOREST PRODUCTS, INC., RUSHMORE FOREST PRODUCTS, INC., SANDERS WOOD PRODUCTS, INC., SPANISH TRAIL LUMBER CO., LLC, SUNDANCE LUMBER COMPANY, INC., THRIFT BROTHERS LUMBER CO., INC., TRINITY RIVER LUMBER COMPANY, TRIPLE T STUDS CO., VIKING LUMBER COMPANY, INC., WARM SPRINGS FOREST PRODUCTS INDUSTRIES, WESTERN CASCADE INDUSTRIES LLC, WRENN BROTHERS, INC., WYOMING SAWMILLS, INC.,** AND **ZIP-O-LOG MILLS, INC.,**

*Plaintiffs-Appellants,*

AND

## HERBERT LUMBER CO.,
*Plaintiff,*

v.

## UNITED STATES AND RON KIRK, UNITED STATES TRADE REPRESENTATIVE,
*Defendants-Appellees.*

————————————

2012-1393

————————————

Appeal from the United States Court of International Trade in No. 08-CV-0036, Judge Richard K. Eaton.

————————————

Decided:  July 1, 2013

————————————

ALAN I. SALTMAN, Smith, Currie & Hancock, LLP, of Washington, DC, argued for plaintiffs-appellants.  With him on the brief was ALAN F. HOLMER.

DAVID S. SILVERBRAND, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendants-appellees.  With him on the brief were STUART F. DELERY, Acting Assistant Attorney General, JEANNE E. DAVIDSON, Director, and FRANKLIN E. WHITE, JR., Assistant Director.

————————————

Before MOORE, LINN, and REYNA, *Circuit Judges.*

REYNA, *Circuit Judge.*

Plaintiffs (collectively, "Almond") are domestic producers of softwood lumber products. Almond initiated this action in the Court of International Trade ("Trade Court"), alleging that United States Trade Representative ("USTR") exceeded its authority by agreeing to certain terms in the Softwood Lumber Agreement it entered into with Canada in 2006. The Trade Court dismissed counts 2, 3, and 4 of the complaint for failure to state a claim and, alternatively, dismissed count 2 as a non-justiciable political question.[1] *Almond Bros. Lumber Co. v. United States*, No. 08-00036, 2012 WL 1372173 (Ct. Int'l Trade April 19, 2012) ("*Dismissal Order*"). Because Almond failed to allege facts to make plausible any of its claims for relief, we affirm.

BACKGROUND

I

For over two decades, members of the United States softwood lumber industry have accused Canada of unfairly subsidizing[2] the production of softwood lumber. These accusations have spawned an enormous amount of litigation. *See Almond Bros. Lumber Co. v. United States*, 651 F.3d 1343 (Fed. Cir. 2011) ("*Almond III*").[3] Over the years, the United States and Canada have entered into a

---

[1]    Count 1 was dismissed separately and is not at issue in this appeal.

[2]    We note that not all subsidies are countervailable under U.S. trade laws. The subsidies referenced in this opinion are those that are alleged or deemed to be countervailable.

[3]    *Almond III* explains the history of this litigation in great detail. We include here only what is necessary to explain our decision.

number of agreements intended to resolve this dispute. *See id.* at 1345-48, 1351.

The history of this case begins in 1986, when the Coalition for Fair Lumber Imports ("Coalition"), "an association made up of many, but not all, domestic softwood lumber producers, filed petitions with the Department of Commerce ('Commerce') and the International Trade Commission ('ITC') alleging that" Canada was subsidizing its softwood lumber exports. *Id.* at 1344-45. Commerce investigated and issued a "preliminary finding that Canada was subsidizing its softwood lumber exports." *Id.* at 1345. This dispute was resolved by a memorandum of understanding (the "1986 MOU") between the United States and Canada that became the first of several such agreements.

In September 1991, Canada terminated the 1986 MOU. *Id.* Shortly thereafter, Commerce initiated a countervailing duty investigation, again determining that Canada was subsidizing softwood lumber exports. *Id.* This initiated a new round of litigation, which the United States and Canada eventually settled by entering into a new settlement agreement ("the 1996 SLA"). *Id.* at 1345-46. In return for Canada's agreement to impose certain export taxes on certain softwood lumber exports to the United States, the United States agreed not to self-initiate any countervailing duty investigations and to dismiss any countervailing duty petitions that were filed on softwood lumber from Canada. *Id.* at 1346.

The 1996 SLA expired on March 31, 2001, and in April 2001, the Coalition filed new petitions with Commerce and the ITC seeking the imposition of both anti-dumping and countervailing duty orders. *Id.* This eventually resulted in the entry of an antidumping duty order and a countervailing duty order. *Id.* at 1346-47. A new round of litigations between the United States and Canada ensued, with Canada appealing these orders to

various fora. *Id.* at 1347. This exhaustive litigation concluded with the United States and Canada entering into a third agreement: the 2006 Softwood Lumber Agreement ("2006 SLA").

Under the 2006 SLA, Commerce agreed to revoke the outstanding antidumping and countervailing duty orders and to refund duties collected on Canadian softwood lumber after May 22, 2002. *Id.* At the time of the agreement, these duties amounted to approximately $5 billion. In return, Canada agreed that for a period of seven years after the 2006 SLA's effective date, it would impose export taxes on certain softwood lumber exported to the United States. *Id.* Paragraphs 4 and 5 of Annex 2C to the 2006 SLA required Canada to distribute $1 billion to various groups in the United States:

> 4.   By the Effective Date, the United States shall provide Canada or its agent with information identifying separate accounts whose beneficiaries are respectively:
>
>> (a) the members of the Coalition for Fair Lumber Imports;
>>
>> (b) a binational industry council described in Annex 13; and
>>
>> (c) meritorious initiatives in the United States identified by the United States in consultation with Canada as described in Article XIII(A).
>
> 5.   Canada or its agent shall distribute $US 1 billion pursuant to the Irrevocable Directions to Pay to the accounts referred to in paragraph 4 in the following amounts: $US 500 million to the members of the Coalition for Fair Lumber Imports, $US 50 million to the binational industry council, and $US 450 million for meritorious initiatives.

Appellant's Br. Addendum 61 ("Distribution Term"). Notably, half of the $1 billion was to be distributed by Canada to a fund benefitting members of the Coalition. Although the 2006 SLA does not state its purpose, the USTR, Canada's Minister of International Trade, and Canada's Industry Minister announced in an April 27, 2006, press release that the 2006 SLA was aimed at "resolving the softwood lumber dispute, including revocation of orders, refund of deposits, imposition of an export measure in Canada and addressing long term policy reform." *Almond III*, 651 F.3d at 1347 (internal quotation marks omitted).

## II

Plaintiffs are domestic softwood lumber producers who are not members of the Coalition and who therefore do not stand to receive any of the $500 million set aside by the Distribution Term to benefit Coalition members. Plaintiffs brought suit in the Trade Court against the United States and the USTR, asserting three theories under which they believed the Distribution Term negotiated by the USTR was contrary to law. Count 2 alleges that by agreeing to a Distribution Term which did not include all members of the domestic softwood lumber industry, the USTR acted outside of its statutory authority. Count 3 alleges that the Distribution Term violates equal protection. Count 4 alleges that the USTR wrongfully delegated the function of determining how much each affected domestic producer should receive to the Coalition, a non-governmental entity.

The Trade Court initially dismissed the complaint for lack of jurisdiction, *Almond Bros. Lumber Co. v. United States*, No. 08-00036, 2009 WL 1397182 (Ct. Int'l Trade May 20, 2009), and denied reconsideration, *Almond Bros. Lumber Co. v. United States*, No. 08-000362010, 2010 WL 1409656 (Ct. Int'l Trade April 8, 2010). This court re-

versed, holding that the Trade Court had jurisdiction under 28 U.S.C. § 1581(i). *Almond III*, 651 F.3d at 1351.

On remand, the Trade Court dismissed all counts. The court concluded that count 2 failed to state a claim because 19 U.S.C. § 2411(c)(4) did not prohibit the USTR from negotiating the Distribution Term. *Dismissal Order*, 2012 WL 1372173, at \*12. It concluded that count 3 failed to state a claim because the Distribution Term "was rationally related to the legitimate government purpose of ending the undesirable trade practices of the Canadian softwood lumber industry." *Id.* at \*14. Finally, it concluded that count 4 failed to state a claim because Almond had "failed to identify a governmental function that was impermissibly delegated," *id.* at \*16, and because Almond lacked standing to object to the Coalition's allocation of funds among its members. *Id.* at \*17.

Plaintiffs timely appealed. This court has jurisdiction under 28 U.S.C. § 1295(a)(5).

DISCUSSION

We review the Trade Court's dismissal of a claim for failure to state a claim de novo. *See Sioux Honey Ass'n v. Hartford Fire Ins. Co.*, 672 F.3d 1041, 1049 (Fed. Cir. 2012). To survive a motion to dismiss for failure to state a claim, "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007) (footnote omitted) (citations omitted). To the extent that the Trade Court based its dismissal on standing, our review of that issue is also de novo. *Canadian Lumber Trade Alliance v. United States*, 517 F.3d 1319, 1330 (Fed. Cir. 2008).

I

Count 2 of Almond's complaint arises under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706,

alleging that the USTR exceeded its authority by negotiating the 2006 SLA's Distribution Term. *See* 5 U.S.C. § 706(2). The USTR's authority to enter into the 2006 SLA derives from 19 U.S.C. § 2411. *See Almond III*, 651 F.3d at 1355. Section 2411(c)(1)(D) provides:

> For purposes of carrying out the provisions of subsection (a) or (b) of this section, the Trade Representative is authorized to . . . enter into binding agreements with such foreign country that commit such foreign country to –
>
> (i) eliminate, or phase out, the act, policy, or practice that is the subject of the action to be taken under subsection (a) or (b) of this section,
>
> (ii) eliminate any burden or restriction on United States commerce resulting from such act, policy, or practice, or
>
> (iii) *provide the United States with compensatory trade benefits that* –
>
>> (I) *are satisfactory to the Trade Representative*, and
>>
>> (II)   meet   the   requirements   of [§ 2411(c)(4)].

(Emphasis added). Section 2411(c)(4) further requires that:

> Any trade agreement described in paragraph (1)(D)(iii) shall provide compensatory trade benefits that benefit the economic sector which includes the domestic industry that would benefit from the elimination of the act, policy, or practice that is the subject of the action to be taken under subsection (a) or (b) of this section, or benefit the economic sector as closely related as possible to such economic sector, unless –

(A) the provision of such trade benefits is not feasible, or

(B) trade benefits that benefit any other economic sector would be more satisfactory than such trade benefits.

Almond argues, as it did below, that § 2411(c)(1)(D) required the USTR to ensure that the $500 million be distributed to all members of the softwood lumber industry and to require that the funds be distributed on the basis of the harm suffered. The government responds that the Trade Court correctly determined that the provisions of the Distribution Term were committed to agency discretion by law, and therefore immune from judicial review under 5 U.S.C. § 701(a)(2).

We agree with the government. Before review may be had under the APA, "a party must first clear the hurdle of § 701(a)." *Heckler v. Chaney*, 470 U.S. 821, 828 (1985). Section 701(a)(2) precludes review of "agency action[s that are] committed to agency discretion by law." This is a narrow exception to the APA's presumption of reviewability, and applies "in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.'" *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971) (quoting S. Rep. No. 79-752, at 26 (1945)); *see also Heckler*, 470 U.S. at 830 ("[R]eview is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion."). A decision is more likely to be committed to an agency's discretion when it requires "a complicated balancing of a number of factors which are peculiarly within its expertise"; for example, questions of whether agency action is likely to be successful or whether a particular action best fits the agency's overall policies. *Heckler*, 470 U.S. at 831; *see also Lincoln v. Vigil*, 508 U.S. 182, 193 (1993).

Section 2411(c) limits the USTR's authority to negotiate for compensatory trade benefits in two ways. First, the compensatory trade benefits must be "satisfactory to the [USTR]." § 2411(c)(1)(D)(iii)(I). Second, the compensatory trade benefits must comply with § 2411(c)(4), which requires that, subject to certain exceptions, the compensatory trade benefits must benefit the economic sector that includes the domestic industry harmed by the unfair trade practice the USTR is seeking to curb, or "the economic sector as closely related as possible to such economic sector."

Almond's attacks go to the substance of the Distribution Term. In particular, Almond objects to (1) the USTR's choice to distribute funds only to those members of the domestic softwood lumber industry that are members of the Coalition, and (2) the USTR's failure to require that compensation be allocated in proportion to the harm suffered. Neither of these arguments relates to § 2411(c)(4)'s requirement that the compensatory trade benefits be directed at a particular economic sector. Accordingly, Almond's arguments can succeed only if the Distribution Term is contrary to § 2411(c)(1)(D)(iii)(I)'s requirement that the compensatory trade benefits must be "satisfactory" to the USTR.

Under § 2411(c)(1)(D)(iii)(I)'s standard, the USTR has discretion to craft whatever relief it deems necessary to resolve the dispute. The negotiation and determination of the terms of international agreements is a paradigmatic example of "a complicated balancing of a number of factors which are peculiarly within [the USTR's] expertise." *Heckler*, 470 U.S. at 831. The statute reflects this: the provision of compensatory trade benefits is not mandatory, any benefits provided need only be "satisfactory" to the USTR, and when benefits are provided, they need not even benefit the economic sector related to the harmful trade practice. *See* § 2411(c). At least with respect to the dispute in this case, the USTR's discretion under

§ 2411(c) is "drawn in such broad terms that . . . there is
no law to apply." *Overton Park*, 401 U.S. at 410 (internal
quotation marks omitted).

Perhaps recognizing that the USTR's decision under
§ 2411(c)(1)(D)(iii)(I) is immune to judicial review, Almond
attempts to ground its arguments elsewhere in the stat-
ute.  First, Almond argues that the compensatory trade
benefits do not benefit the economic sector as required
under § 2411(c)(4) unless they benefit every member of
the affected domestic industry.  The language of para-
graph four contains no such restriction, requiring only
that the compensatory trade benefits "benefit the econom-
ic sector which *includes* the domestic industry."
§ 2411(c)(4) (emphasis added).     Nevertheless, citing
*Samish Indian Nation v. United States*, 419 F.3d 1355,
1367 (Fed. Cir. 2005), Almond asserts that paragraph four
is a remedial statute and should be interpreted broadly.
But it is unclear, and Almond does not explain, whether §
2411(c) is in fact remedial and, if so, how this requires us
to construe "benefit the economic sector which includes
the domestic industry" to mean "benefits every member of
the domestic industry."

Almond also attempts to ground its argument in the
term "compensatory," arguing that this term requires that
compensation be distributed in proportion to the harm
experienced by each individual member of the domestic
industry.  Almond is correct that the plain meaning of this
term "connotes offsetting an error or undesired effect."
But the plain meaning of "compensatory" does not require
that damages be allocated in any particular way.  Indeed,
as discussed above, such a restriction would be contrary to
the remainder of the statute, which allows the USTR
considerable latitude to distribute benefits not only to
members of the domestic industry, but also to other
economic sectors if, in the USTR's judgment, this would
be more satisfactory.  Reading additional restrictions into
the term "compensatory" would not comport with the

statutory scheme. *See Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme. A court must therefore interpret the statute as a symmetrical and coherent regulatory scheme, and fit, if possible, all parts into an harmonious whole.") (citations omitted) (internal quotation marks omitted).

We reject Almond's arguments that § 2411(c) required the USTR to compensate every member of the domestic softwood lumber industry and that the compensation was required to be proportional to the harm suffered. Almond's arguments attack the substance of the Distribution Term, which defines the compensatory trade benefits that the USTR secured from Canada in the 2006 SLA. Whether those benefits were satisfactory is a question that is committed to the discretion of the USTR and therefore beyond judicial review.

II

Count 3 of the complaint alleges that the Distribution Term violates equal protection. The Trade Court found that the term was "rationally related to the legitimate government purpose of ending the undesirable trade practices of the Canadian softwood lumber industry, and to settle the ongoing litigation concerning the U.S.-Canadian softwood lumber trade." *Dismissal Order*, 2012 WL 1372173, at *14. It based this conclusion on its findings (1) that the Coalition was the primary representative of the industry in the various proceedings that were ongoing when the 2006 SLA was negotiated, and (2) that in exchange for the Distribution Term, counsel for the Coalition agreed to dismiss more than 20 lawsuits that were pending when the 2006 SLA was signed. *Id.* Almond argues that these two findings are clear error and that the dismissal of count 3 should therefore be reversed.

It is undisputed that rational basis scrutiny applies to the equal protection claim alleged by Almond in count 3. Under rational basis, "a classification must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Heller v. Doe*, 509 U.S. 312, 320 (1993) (internal quotation marks omitted). "A statutory classification fails rational-basis review only when it rests on grounds wholly irrelevant to the achievement of the State's objective." *Id.* at 324 (internal quotation marks omitted). The burden is on Almond to negate every conceivable basis that might support the Distribution Term, regardless of whether the basis has a foundation in the record. *See id.* at 320-21.

"Softwood lumber has been a perennial sore-spot in trade relations between the United States and Canada," *Tembec, Inc. v. United States*, 441 F. Supp. 2d 1302, 1306 (Ct. Int'l Trade 2006), and the Coalition has been heavily involved in this issue since at least 1982. *See id.* n.4. Indeed, it was the Coalition's 1986 unfair trade petitions to Commerce and the ITC that began the series of events leading to the 2006 SLA. The Trade Court determined that "[t]he Coalition was the primary representative of the domestic industry in the various proceedings that were ongoing when the SLA was negotiated" and that "[t]he Coalition bore the time and expense of extensive legal battles to address the practices of the Canadian industry." *Dismissal Order*, 2012 WL 1372173, at *14-15. It concluded that this provided "a sufficient rationale for compensating its members to the exclusion of more passive members of the domestic lumber industry, such as plaintiffs." *Id.* at *15.

Almond's challenges to the Trade Court's observations are unpersuasive. To the contrary: Almond concedes that the Coalition filed the initial petitions in 1986, and that it did so again in 2001, obtaining "letters from companies representing at least 60% of the United States production

of softwood lumber" supporting its petition.  Appellant's Br. 8.

Instead, Almond contends that since the "Termination of Litigation" provision in Annex 2A was not included in the final agreement, the Trade Court's ruling cannot stand.  But regardless of whether the Coalition agreed to dismiss any suits, the fact remains that over a long period the Coalition organized the necessary industry support, including financial support and the submission of questionnaire responses, legal briefs, and industry trade data, for the petitions that caused the government to initiate investigations.  To state a plausible equal protection claim, Almond needed to negate every conceivable basis that could support the Distribution Term.  By resting its argument on the distinction between the Coalition being party to the suit and the Coalition acting as the driving force behind this litigation, it has failed to do so.

## III

Count 4 of the complaint alleges that the USTR wrongfully delegated the function of determining how much each affected domestic producer should receive to a non-governmental entity, the Coalition.  Almond cites to a small number of non-binding cases dealing with different statutes and different agencies as support for its argument that agency officials generally may not delegate their authority to private entities.  *See, e.g.*, *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 565 (D.C. Cir. 2004) ("[C]ase law strongly suggests that subdelegations to outside parties are assumed to be improper absent an affirmative showing of congressional authorization."); *see also Nat'l Ass'n of Regulatory Utility Comm'rs v. FCC*, 737 F.2d 1095, 1143 n.41 (D.C. Cir. 1984).  We will assume, as did the Trade Court, that this statement of the law is correct.[4]

---

[4]    The Trade Court cited "5 U.S.C. § 706(a)(2)" for the proposition that "[a]n agency's impermissible delega-

The Trade Court concluded that the USTR had not delegated the decision to compensate only Coalition members, noting that "the determination that some domestic softwood lumber producers (i.e., Coalition members) were to receive payments from Canada to the exclusion of others was not delegated because the Distribution Term was negotiated and agreed to by the USTR." *Dismissal Order*, 2012 WL 1372173, at *17. We agree and conclude that to the extent that count 4 alleges that the USTR delegated this decision, it has failed to state a claim.

In addition, the Trade Court observed that count 4 could also be read as an objection to the delegation of the allocation of payments made among members of the Coalition. *Id.* The court concluded that under this reading, Almond lacked standing: since the USTR had lawfully excluded Almond from the Distribution Term, Almond could not be injured by the Coalition's decision of how to distribute the funds. We agree.

CONCLUSION

For the foregoing reasons, the decision of the Trade Court dismissing counts 2, 3, and 4 for failure to state a claim is affirmed. Because our decision affirms the dismissal of Almond's entire complaint, we need not reach

---

tion is unlawful and will be set aside under the APA." *Dismissal Order*, 2012 WL 1372173, at *16 n.14. Assuming that the court meant to cite § 706(2)(A), we understand its use of the term "unlawful" to mean that the court believed such a subdelegation to be "not in accordance with law." Section 706 is silent on the issue of subdelegation, and we are aware of no case to have stated that it precludes subdelegation. We note, however, that if the USTR is allowed to subdelegate its power, count 4 must be dismissed. Accordingly, we assume for our analysis that subdelegation is not allowed.

the issue of whether count 2 presented a non-justiciable political question.

**AFFIRMED**